# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| JOLENE HENNENFENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   10-cv-1422 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

# O R D E R   &   O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary Affirmance. (Docs. 15 & 17). For the reasons stated below, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Motion for Summary Affirmance is granted.

## STANDARD OF REVIEW

To be entitled to disability benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination. *See McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made to decide whether the claimant is presently involved in a substantially gainful activity. 20 C.F.R. §§ 404.1520(a)(i), 416.920(a)(i). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. §§ 404.1520(a)(iii), 416.920(a)(iii). If the claimant has an impairment that significantly limits her physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements of one of the Listings are met or equaled, he declares the claimant eligible for benefits. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv); 20 C.F.R. Part 404, Subpart P, Appendix 1.

If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps. At the fourth step, the claimant's residual functional capacity ("RFC") is evaluated to determine whether the claimant can pursue her past work. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv). If she cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy. 20 C.F.R. §§ 404.1520(a)(v), 416.920(a)(v). If the claimant is disabled, but there is evidence of drug or alcohol abuse, the Commissioner must consider whether the claimant would still be considered disabled if she stopped using drugs and/or alcohol; if not, she cannot receive benefits. 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535.

The claimant has the burden to prove disability through step four of the analysis, *i.e.*, she must demonstrate an impairment that is of sufficient severity to preclude her from pursuing her past work. *McNeil*, 614 F.2d at 145. However, once the claimant shows an inability to perform her past work, the burden shifts to the Commissioner, at step five, to show the claimant is able to engage in some other type of substantial gainful employment. *Id.*

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Maggard*, 167 F.3d at 379 (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In a substantial evidence determination, the Court will review the entire administrative record, but it will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The Court must ensure that the administrative law judge ("ALJ") "build[s] an accurate and logical bridge from the evidence to [her] conclusion," even though she need not have addressed every piece of evidence. *Id.* at 872.

## PROCEDURAL HISTORY

Plaintiff applied for disability benefits in January 2009, alleging a disability onset date of October 1, 2008. (Tr. 124-28). After her application was denied initially and upon reconsideration, she requested a hearing. (Tr. 68, 74). ALJ Diane Raese

Flebbe held a hearing on February 10, 2010, and issued her opinion denying Plaintiff benefits on February 16, 2010. The Appeals Council denied Plaintiff's request for review. (Tr. 1-5). Plaintiff filed her request for judicial review by this Court, pursuant to 42 U.S.C. § 405(g), on December 22, 2010. (Doc. 1).

## RELEVANT MEDICAL HISTORY

On March 14, 2008, Plaintiff entered the emergency room on the anniversary of her first husband's and son's deaths, reporting that she wanted to kill herself. Plaintiff reported that she had had 4-5 drinks, and that she had tried to cut her wrist the previous weekend. (Tr. 290-95). Her blood alcohol level upon admission was 178. (Tr. 268). She was transferred to another hospital on March 15, 2008, from which she was discharged on March 20, 2008. (Tr. 210-42).

During the March 2008 hospitalization, Dr. Thena Poteat noted that Plaintiff had "reported numerous stressors including conflict between her husband and family member, continued difficulty dealing with the death of her mother," as well as the deaths of her son and first husband; Plaintiff had also recently quit her job as a CNA for unrelated reasons. (Tr. 211, 213). Plaintiff's family did not support her decision to seek treatment, which was distressing to her. (Tr. 211, 222). Dr. Poteat found that Plaintiff's "mood improved significantly" as she received more support from her husband and children throughout her hospitalization. (Tr. 211, 224). Plaintiff reported that she had tried several different antidepressants, but they had not been fully successful. (Tr. 213). Plaintiff also reported "frequent binges on alcohol," every several weeks, and that when she drank, she frequently did so to get drunk; Dr. Poteat "encouraged her to be honest about the role of alcohol in her

depression." (Tr. 214, 224). Plaintiff reported to a social worker at the hospital that she planned to attend a 12-step program and "avoid routines that resulted in her drinking behavior;" Plaintiff believed that "her alcohol consumption contributed to her downward spiral." (Tr. 240). Dr. Poteat diagnosed Plaintiff with recurrent, severe major depressive disorder, without psychotic features. (Tr. 215). When she was discharged, Plaintiff was in a good mood, with a "bright" affect, and no indication of a psychotic process. Plaintiff denied any suicidal or homicidal ideation, and "acknowledged the need to address her alcohol use and to abstain from further alcohol use." (Tr. 212, 219). Plaintiff had a checkup on October 6, 2008, at which it was noted that her medications "are working;" on October 28, she was referred to Dr. Ralph Saintfort. (Tr. 253, 255).

On October 29, 2008, Plaintiff saw Dr. Saintfort. (Tr. 301). She reported that she had "significantly regressed" since her March 2008 hospitalization, and that her physician had been unable to find an appropriate anti-depressant medication. (Tr. 301). She had been feeling more depression and anxiety, and vaguely indicated that she was experiencing flashbacks of childhood molestation, as well as grief over the loss of her first husband, son, and mother, and family conflicts. (Tr. 301). She saw Dr. Saintfort again in December 2008, reporting that she was still feeling depressive symptoms and sleeping through much of the day. (Tr. 300). However, she did "not endorse any suicidal ideation, plans, or intent," and was "in good spirit, spontaneous, organized, and goal-directed." (Tr. 300). Dr. Saintfort reviewed her medications and added a new prescription to address her mood and anxiety. (Tr. 300).

Plaintiff reported to the emergency room on March 16, 2009, having cut her wrists superficially both three days prior and on that date. (Tr. 271-76). She reported to the triage nurse that she had last cut herself two or three months before. (Tr. 271). Plaintiff reported having had five drinks; her alcohol level was 163. (Tr. 271, 278). The next day, Plaintiff saw a social worker, who also noted that Plaintiff was intoxicated when she cut herself and that two or three months previously, she had planned "to use exhaust to kill herself." (Tr. 274). The social worker noted that Plaintiff's current problem was triggered by her son's arrest for drugs and her father having cancer; her husband also had cancer. (Tr. 274). Plaintiff attributed her wishes to die to episodes of drinking. (Tr. 275). Plaintiff reported feeling anxious, but had been working on getting out of the house though she felt panic and anxiety when leaving home. (Tr. 275).

Plaintiff saw Dr. Saintfort again on March 24, 2009. (Tr. 297-99). She reported to him that she had been doing well avoiding alcohol until her son's 21st birthday, when she went out drinking with him; since then, she had "regressed to having lapses in her abstinence from alcohol." (Tr. 297). She stated that her self-mutilation had been triggered by alcohol intoxication, but that she now self-mutilated when feeling numb or empty; she denied a suicidal intention, explaining that she cut herself as a means of coping. (Tr. 297-98). The hospitalization earlier in the month had been triggered by an intentional binge drinking episode. (Tr. 297). Since then, Plaintiff had not felt the urge to cut herself, and had not binged on alcohol. (Tr. 298). Plaintiff's family physician had recently changed her medications, and Dr. Saintfort suggested other changes. (Tr. 298-99). On April 9, 2009, Plaintiff

had a checkup, at which it was noted that her Abilify medication "seem[ed] to be helping," and that she was "getting out, able to work a little bit." (Tr. 257). Plaintiff cut her finger on a can (apparently accidentally) on April 14, 2009, and went to see her doctor about it the next day; she also had had a fever for about a week. (Tr. 347).

On May 14, 2009, Plaintiff was referred for an emergency psychiatric evaluation, as she had cut her wrist while drinking. (Tr. 310-11). She also reported to hospital staff having had eight alcoholic drinks in three hours, and that she had planned to kill herself with her car exhaust; she had called her brother, who took her to the hospital. (Tr. 303). She had not taken her Xanax that day. (Tr. 303). By the end of the day, though, she was "pleasant, laughing, cooperative," and "express[ed] wishes to go to [Alcoholics Anonymous]." (Tr. 305). Plaintiff reported on June 5, 2009 for a follow-up. (Tr. 345).

Dr. Charles Farrar, a licensed clinical psychologist, issued a mental status evaluation of Plaintiff on May 18, 2009, at the request of the state agency. (Tr. 320-22). His evaluation was based on an interview with Plaintiff and on her disability application. (Tr. 320). Dr. Farrar diagnosed Plaintiff with major depressive disorder, post traumatic stress disorder, and alcohol addiction. (Tr. 321). Plaintiff reported to him that she was disabled because she could not leave her house, had started cutting herself, and had planned to commit suicide. (Tr. 320). She reported difficulty keeping jobs due to excessive absences and panicky feelings preventing her leaving the house. (Tr. 320). Plaintiff's husband and stepson prepared the meals and did most of the housework, though Plaintiff did handle the bill-paying. (Tr.

320). She stated that she spent most of her time in bed, and rarely got dressed. (Tr. 320). Dr. Farrar found that Plaintiff's intelligence appeared to be normal, and that her thought processes were normal, though her affect was depressed. (Tr. 321). Neither her short-term nor long-term memory were significantly impaired, but her sustained concentration and persistence were impaired. (Tr. 321). He found that, except for when she was intoxicated, Plaintiff understood and could conform to societal rules and expectations. (Tr. 321).

Dr. Patricia Beers completed a Psychiatric Review Technique form and a Mental RFC Assessment of Plaintiff on June 3, 2009. (Tr. 323-36, 337-40). In the Psychiatric Review Technique, Dr. Beers considered whether Plaintiff met the requirements of Listings 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders), 12.08 (Personality Disorders), and 12.09 (Substance Addiction Disorders), and determined that an RFC assessment was necessary. (Tr. 323). Listings 12.04, 12.06, and 12.08 require that a claimant meet the requirements of their paragraphs "A" and "B," or that the requirements of their paragraph "C" are met. Paragraph "B" requires at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Listing 12.09 requires a finding that the substance abuse causes symptoms of the severity required to meet, *inter alia*, Listings 12.04, 12.06, or 12.08.

For these disorders' paragraph "B" requirements, Dr. Beers found that Plaintiff had only moderate restrictions in her activities of daily living and in

maintaining social functioning, mild limitations in maintaining concentration, persistence, or pace, and one or two extended episodes of decompensation; she thus did not meet the paragraph "B" requirements. (Tr. 333). She also found that Plaintiff did not meet the paragraph "C" criteria of these Listings. (Tr. 334). Dr. Beers, relying on Plaintiff's self-report, Dr. Farrar's evaluation, and Plaintiff's medical and psychiatric history, found that Plaintiff "becomes suicidal with she is intoxicated," which was "a consistent pattern." Plaintiff "attempt[ed] to manage her depression and anxiety with alcohol and the result is an increase in impulsive and manipulative behavior." She noted that Plaintiff had normal cognitive abilities, and lacked motivation, though she could "complete most household chores when motivated to do so." Finally, she found that, though Plaintiff claimed social difficulties, there was "no medical evidence that would support significant impairments in her social skills except when she is intoxicated." Dr. Beers concluded that Plaintiff was capable of substantial gainful activity. (Tr. 335).

After completing the detailed findings of the Mental RFC Assessment form, Dr. Beers concluded that, though the medical records supported the diagnoses of major depression, post traumatic stress disorder, personality disorder, and alcohol dependence, she was capable of substantial gainful activity. (Tr. 339). Dr. Beers noted that Plaintiff's episodes of decompensation occurred when she was intoxicated, but that she had normal intelligence, a positive work history, and the ability to "understand, recall, and execute simple one-to-two step instructions and carry out routine tasks." (Tr. 339). She found that Plaintiff's treatment providers

did not note impaired social skills, and that Plaintiff would be able to handle work with minimal interaction with others. (Tr. 339).

Dr. Joseph Mehr performed a Psychiatric Review Technique on August 27, 2009. (Tr. 349-62). He found that Plaintiff met the requirements of Listing 12.09, evaluated under Listings 12.04 and 12.06. (Tr. 357). He found that she had marked restrictions in her activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace; he also found that she had had one or two extended episodes of decompensation. (Tr. 359). Dr. Mehr noted that Plaintiff had been diagnosed with major depressive disorder, but was doing fairly well on her medication. (Tr. 361). He further found that her "most significant issue" was alcohol dependence, noting that each hospitalization was "precipitated by binge drinking ending in self-mutilation." (Tr. 361). Plaintiff's appeal following the previous denial of benefits was based on her "recent hospitalization for suicidality," but "again she was very intoxicated at the time of the event." (Tr. 361). He noted that Plaintiff no longer saw her previous psychiatrist, who had been aware of her drinking problem, and that she currently was treated by a general practitioner who did not appear to be aware of it. (Tr. 361). Dr. Mehr concluded that Plaintiff's "DAA [drug addiction and alcoholism] is material." (Tr. 361).

Plaintiff went to the emergency room on October 11, 2009, complaining of chest pain. (Tr. 380-84). Plaintiff was taken to the emergency room on January 27, 2010, having attempted to cut her wrist. (Tr. 366). She had lost track of how many Jack Daniels & Cokes she had had to drink; her blood alcohol level was 188. (Tr. 366, 369, 375). The next day, she denied any intent to kill herself, stating that she

"shouldn't drink." (Tr. 373). She was "cheerful and laugh[ed] easily," and reported maintaining her usual activities. (Tr. 373).

On February 5, 2010, Licensed Clinical Social Worker Idelle Butler, who was also Plaintiff's treating psychotherapist, issued a Mental Medical Source Statement regarding Plaintiff. (Tr. 387-92). Ms. Butler stated that Plaintiff's "panic and anxiety [were] self-managed for brief periods resulting in successful job searches; however, job can be maintained for only short periods." (Tr. 387). She believed that Plaintiff was somewhere between "limited but satisfactory" and "seriously limited, but not precluded" in her ability to "maintain regular attendance and be punctual with customary, usually strict tolerances," and that she was between "seriously limited, but not precluded" and "unable to meet competitive standards" in her ability to "deal with normal work stress." (Tr. 389). In all other work abilities and aptitudes, Ms. Butler found Plaintiff to be unlimited or limited but satisfactory. (Tr. 389). She justified her findings as to Plaintiff's limitations by noting that her "on-the-job performance of tasks and relationships is reportedly excellent until the internal anxiety level builds, resulting in uncontrollable anxiety and panic episodes which preclude continuing performance." (Tr. 389). Similarly, she found that Plaintiff was unlimited in her ability to do semiskilled or skilled work, except that she was "seriously limited, but not precluded," in her ability to deal with stress. (Tr. 390). Ms. Butler opined that Plaintiff found "remaining at work for a full day," "fear of failure," and "little latitude for decision-making" stressful, and believed that she would potentially miss work four or more days per month, depending on the physical and emotional support available. (Tr. 391). She opined that Plaintiff would

have difficulty dealing with work because the stress from normal job situations caused increasing anxiety levels and panic attacks, though Plaintiff was capable of performing the demands of the job and dealing with stress with support. (Tr. 391). She believed that Plaintiff's alcohol abuse did not contribute to her limitations, as she used alcohol and self-mutilation to relieve her stress and anxiety. (Tr. 392). Ms. Butler felt that Plaintiff's abilities would only be minimally improved if she were to stop drinking, as it was only a coping technique. (Tr. 392).

Ms. Butler wrote a letter in support of Plaintiff's appeal of the ALJ's decision on May 3, 2010, in which she opined that "[i]n the past few months, her functioning in daily routines, such as leaving her apartment to do required shopping and keeping her therapy appointments, has become increasingly hampered by acute anxiety and intense panic episodes;" the "episodes can occasionally be self-managed," but "this is becoming difficult for her." (Tr. 394). Ms. Butler stated that though Plaintiff's medications "do provide relief and an increased level of control, the effects do not appear, and generally historically are not likely to be, curative." (Tr. 394).

## HEARING TESTIMONY

Plaintiff, represented by her attorney,[1] appeared at a hearing before the ALJ on February 10, 2010. (Tr. 26-65). Vocational expert James Ragains also appeared and gave testimony. (Tr. 58-64). After the ALJ introduced herself and Mr. Ragains, Plaintiff's attorney gave an opening statement, arguing that Plaintiff's self-injuring behavior occurred even when Plaintiff was not under the influence of alcohol, and

---

[1] Plaintiff was represented by attorney Michael Mannino until after the hearing, but is represented by Ellen Hansen for the instant appeal.

that Plaintiff's impairments met the requirements of Listing 12.06. (Tr. 30-31). Plaintiff testified that she became disabled on October 1, 2008, when she was preparing to report to work, but "started having thoughts of suicide and hurting" herself, so she called her employer to ask to be taken off of the work schedule. (Tr. 31).

The ALJ asked Plaintiff if she had any physical impairments, to which Plaintiff responded that she had asthma, which was well-controlled with medication; she testified that if asthma were her only problem, she would be able to work. (Tr. 32-33). Plaintiff testified that she had symptoms of depression constantly, staying home and sleeping a lot with the television on in order to feel less alone. (Tr. 33-34). She stated that she slept 12-15 hours each day, and that she had no appetite and had lost 35 pounds over the last year; she sometimes would "hibernate" and avoid contact with people. (Tr. 34-35). Plaintiff testified that she sometimes cut herself, not to attempt suicide, but to release the pressure of her feelings. (Tr. 36). She stated that she last cut herself the previous week, in response to the anxiety of the upcoming hearing. (Tr. 36).

When asked about her memory, Plaintiff testified that her only memory problem was that she needed a planner to remember whether she had taken her medications. (Tr. 37). She testified that she could not focus well, and tended to "drift off" while watching television or crocheting. (Tr. 37). She felt that her medications enabled her to function, but that she still sometimes had additional "breakthrough" anxiety when something particularly stressful occurred; she took Xanax for this breakthrough anxiety. (Tr. 38). Plaintiff did not experience any side effects from her

medications. (Tr. 38). She had periods of breakthrough anxiety, lasting for 20-30 minutes until the Xanax took effect, about every two months. (Tr. 40). Plaintiff always felt some level of anxiety, which caused her to feel that she needed to move all of the time. (Tr. 40). She testified to having nightmares two or three times a month. (Tr. 41). She also testified that she was anxious about being around people, but she had started going to the library for short periods of time, as advised by her therapist. (Tr. 41-42).

The ALJ next questioned Plaintiff about her alcohol use. (Tr. 42). Plaintiff testified that she did not drink at home. (Tr. 42). Plaintiff had last used alcohol the previous month, in response to certain stressors, and had ended up in the emergency room. (Tr. 42-43). Prior to that, it had been several months since she had drunk alcohol. (Tr. 43). Typically, she testified, she responded to stress by cutting herself, but sometimes would drink. (Tr. 43). The ALJ asked about Plaintiff's hospitalization in May of the previous year, when she had been drinking, and Plaintiff testified that she was stressed about her husband's behavior. (Tr. 43-44).

Following the ALJ's questions, Plaintiff's attorney questioned her about her drinking. (Tr. 44-45). Plaintiff testified that she drank as a means of coping with stress, and that she would drink every two to three months. (Tr. 45-46). She also testified that she cut herself three to four times a month, and that she was not typically drinking when she did so. (Tr. 46). Occasionally, Plaintiff's initial does of Xanax would not help with her breakthrough anxiety, so she would have to take more. (Tr. 47). She had once, just a few days prior to the hearing, exceeded the maximum daily dosage of Xanax in an attempt to control her anxiety. (Tr. 47).

Plaintiff testified that she had lost previous jobs because she would have panic attacks and anxiety causing her to be unable to leave her home. (Tr. 48). She had tried to work from November 2009 to January 2010, but had missed seven days of work due to anxiety attacks. (Tr. 48). She was ultimately fired from that job because she did not feel comfortable as a CNA distributing medication to patients in the assisted living facility. (Tr. 48-49).

Her attorney asked Plaintiff about her sleep habits, to which Plaintiff responded that she woke up throughout the night due to her anxiety, and felt exhausted upon waking. (Tr. 49-50). During the day, she would set up an air mattress in the living room and lay on it watching television. (Tr. 50). Plaintiff also testified that her anxiety caused her to shake frequently, caused her to hyperventilate and have shortness of breath, and caused diarrhea. (Tr. 51). She stated that she sometimes felt afraid to go out, or even to go downstairs to check the mail or turn in her rent check; she had to mentally prepare herself to go out. (Tr. 52-53). Sometimes she would not get out of her pajamas for days at a time, and would go two weeks without taking a shower. (Tr. 53).

The ALJ and Plaintiff's attorney reviewed Plaintiff's work history prior to the alleged onset of disability with her. (Tr. 54-57). The ALJ then turned to the vocational expert, Mr. Ragains. (Tr. 58). The ALJ clarified that Plaintiff's past relevant work included jobs as a teller, doing medical transcription, and as a nursing assistant. (Tr. 58-59). She then asked the vocational expert to assume the following limitations when testifying as to whether Plaintiff could perform any of

her past work:[2] limiting understanding, remembering, and carrying out work instructions to those learned within 30 days; a routine, repetitive work environment; no work as a member of a team; occasional work interaction with coworkers and supervisors; no face-to-face interaction with the general public; no climbing of ladders, ropes, and scaffolding or work with other hazards;[3] no exposure to noise over a certain level; and no concentrated exposure to temperature extremes and dust, fumes, gases, and other environmental chemicals or irritants.[4] (Tr. 59-60). The vocational expert testified that Plaintiff could not perform her past relevant work with these limitations. (Tr. 60).

However, assuming a hypothetical individual with these limitations and Plaintiff's age, education, and work experience, the vocational expert testified that there were other jobs that could be performed. (Tr. 60). He testified that such a person could perform unskilled work, such as a hand packager, housekeeper, or mail clerk. (Tr. 61). The ALJ then asked whether those jobs would remain if those same limitations were kept, but the hypothetical individual could also not work at a consistent pace, though she would be able to fulfill the expectations for an eight-hour shift, and the vocational expert testified that this limitation would eliminate the hand packaging job. (Tr. 61-62). If the employee missed two or more days a month, or required an hour a day of additional breaks, she would not be able to keep

[2] The ALJ noted that each of these limitations was made "in an effort to minimize stress from on the job situations." (Tr. 59).

[3] This limitation was given in order to account for "possible lapses in judgment" "or inability to recognize dangers or hazards." (Tr. 59).

[4] The final limitation was made in an effort to avoid exacerbation of Plaintiff's asthma. (Tr. 60).

an unskilled job. (Tr. 62). In addition, a person with the housekeeper or mail clerk jobs would need to maintain at least an 80 percent effectiveness rate in order to keep the job. (Tr. 64). Finally, the vocational expert testified that his testimony was consistent with the *Dictionary of Occupational Titles*. (Tr. 64).

## ALJ's DECISION

The ALJ issued her opinion denying Plaintiff's claim for benefits on February 16, 2010. (Tr. 13-22). She first noted the issues to be dealt with: whether Plaintiff was disabled, whether Plaintiff's substance abuse disorder was a contributing factor material to the finding of disability, and whether Plaintiff had met the insured status requirements of the Social Security Act. (Tr. 13). As to the last question, the ALJ found that Plaintiff had acquired sufficient quarters of coverage to remain insured through December 31, 2013, and so must establish disability on or before that date. (Tr. 13). After reviewing the applicable law, the ALJ turned to her findings of fact and conclusions of law, finding that Plaintiff had not engaged in substantial gainful activity since October 21, 2008, her alleged onset date of disability. (Tr. 14-15).

The ALJ then found that Plaintiff has the severe combination of impairments of depression, anxiety, and a substance abuse disorder, which cause more than minimal limitations to Plaintiff's ability to work. (Tr. 16). She found that Plaintiff's impairments meet the requirements of Listings 12.04, 12.06, and 12.09. The ALJ found that the requirements of paragraph "A" for both Listings 12.04 and 12.06 were met because Plaintiff has a documented history of substance abuse: though she does not drink often, when she drinks, she does so in order to become

intoxicated. (Tr. 16). All but one instance of Plaintiff's cutting herself occurred while engaging in alcohol abuse; she also reported depressive symptoms and suicidal thoughts while intoxicated. (Tr. 16).

The ALJ also found that Plaintiff met the paragraph "B" requirements of Listings 12.04 and 12.06. She found that Plaintiff had only moderate restriction in her activities of daily living, and only one or two episodes of decompensation, rather than the three episodes within one year that are required. However, the ALJ found that Plaintiff had marked difficulties in social functioning, and in concentration, persistence, or pace, so she met the paragraph "B" requirements. (Tr. 16). The ALJ noted that she gave Ms. Butler's opinion, which acknowledged Plaintiff's alcohol abuse, "significant weight" in this analysis, and that "the impact of substance abuse is also supported by Dr. Farrar's May 2009 consultative examination." (Tr. 16-17).

The ALJ then turned to an evaluation of Plaintiff's impairments if she were to stop the substance abuse, finding that Plaintiff's depression and anxiety, even without the substance abuse, constituted a severe impairment or combination of impairments. (Tr. 17). However, she would no longer meet or equal the requirements of any of the Listings. Specifically, she would have only mild restriction in activities of daily living, moderate difficulties with social functioning, moderate difficulties with concentration, persistence, or pace, and no episodes of decompensation, so she would not meet the requirements of paragraph "B" of Listings 12.04 or 12.06. Likewise, she would not meet the requirements of those Listings' paragraph "C." (Tr. 17).

The ALJ determined that, absent the substance abuse, Plaintiff had the RFC to perform the full range of work at all exertional levels, except for certain nonexertional limitations needed to reduce Plaintiff's stress. These limitations include:

> understand[ing], remember[ing], and carry[ing] out work instructions learned within 30 days in a routine and repetitive work environment, with no work as a member of a team but otherwise occasional work interactions with co-workers and supervisors, with no face-to-face work interactions with the general public, no climbing of ladders, ropes[,] or scaffolds, and no work around hazards such as dangerous machinery and unprotected heights.

(Tr. 17-18). The ALJ further found that Plaintiff "could complete the expected amount of work for an eight-hour period but not at a consistent pace. She could work at a noise level of 3 or less...and would need to avoid concentrated exposure to temperature extremes and fumes, dust, odors, gases[,] and other environmental irritants." (Tr. 18). In determining this RFC, the ALJ found that Plaintiff's impairments could produce the symptoms that she alleged, but that Plaintiff's allegations as to the "intensity, persistence, and limiting effects" of them was not fully credible. The ALJ's primary basis for finding that Plaintiff's allegations were not credible was the fact that all of her episodes of self-injury were "coupled with findings of substance abuse." (Tr. 18). In addition, Plaintiff's "symptoms appear to be amenable to treatment." (Tr. 19).

The ALJ supported these observations with a review of Plaintiff's medical history, including Plaintiff's treatment by Dr. Saintfort and Dr. Baumgardner. (Tr. 19). The ALJ specifically noted that she did not give significant weight to Ms. Butler's February 2010 report, in which Ms. Butler had opined that Plaintiff would

be limited in her ability to function even absent alcohol abuse, as the record did not establish that Plaintiff experienced "cutting episodes or other signs of disabling mental problems in the absence of alcohol abuse." (Tr. 19). The ALJ's conflation of cutting episodes and alcohol abuse conflicts with Ms. Butler's opinion that Plaintiff's substance abuse, along with her self-mutilation, were both coping mechanisms to deal with Plaintiff's underlying stress, anxiety, and expected panic attacks. The Court cannot say that the ALJ's interpretation vis-à-vis Ms. Bulter's interpretation is without substantial support in the record.

The ALJ further found that Plaintiff's ability to perform routine daily activities indicated only mild restrictions in daily activities, and that, though Plaintiff testified that she spent most of her days at home in bed, this was attributable to alcohol abuse. (Tr. 19). Plaintiff had only a moderate restriction on her ability to socialize; though she stayed home most of the time, "there is no record of evictions, altercations, or severe social isolation," she had been getting out more, and Dr. Farrar had noted that she maintained appropriate eye contact and was cooperative. (Tr. 20). The ALJ also found moderate restrictions on Plaintiff's "ability to concentrate and attend," giving "some weight" to Plaintiff's allegation of memory and concentration problems. (Tr. 20). However, the ALJ also relied on Dr. Farrar's conclusion that there was no indication of a thought disorder, and that Plaintiff's short-term memory was not significantly impaired. (Tr. 20). Dr. Farrar had found Plaintiff's sustained concentration and persistence to be impaired, but he had not factored out her substance abuse, so this finding was limited. (Tr. 20). The ALJ also gave the State Agency physicians' opinions significant weight in determining

Plaintiff's RFC, as they were consistent with the record. (Tr. 20). Finally, she noted that, other than Plaintiff's allegations of disability, Plaintiff was a "generally credible witness," and her testimony concerning her difficulty handling stress was given significant weight and was reflected in the RFC limitations. (Tr. 20).

After determining Plaintiff's RFC, the ALJ found that Plaintiff would be unable to return to her previous work even if she stopped abusing alcohol. (Tr. 20). However, considering the testimony of the vocational expert, Plaintiff would be able to perform a significant number of jobs in the national economy if she stopped abusing alcohol, so she was not disabled under the Social Security Act. (Tr. 21).

## DISCUSSION

Plaintiff makes several arguments in support of her appeal: that the ALJ erred in determining that Plaintiff's impairments met the requirements of certain Listings, but then finding her to be not disabled; that the ALJ erred in considering the effects of Plaintiff's substance abuse on the question of whether she would meet or equal the requirements of certain Listings; that the ALJ erred in evaluating Plaintiff's mental impairments; and that the ALJ erred in partially rejecting Ms. Butler's opinion. The Court rejects each of these arguments, and finds that the ALJ's decision was supported by substantial evidence.

## I.    Applicability of Listings to Plaintiff's case

Plaintiff's first argument is that the ALJ made an error of law in finding that Plaintiff met Listings 12.04, 12.06, and 12.09, but also denying her benefits. (Doc. 16 at 12-13). Ordinarily, it is true that if the ALJ finds that a claimant's impairments meet or equal the requirements of a Listing, the claimant will be found

to be disabled and entitled to benefits. However, in cases in which there is medical evidence of alcohol or drug abuse, the ALJ must determine if drug addiction or alcoholism is a contributing factor material to the determination of disability, or, in other words, what the claimant would be able to do if she were to stop abusing alcohol or drugs. 20 C.F.R. § 404.1535(b)(2) ("[W]e will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling."). If she would still be disabled, then she is entitled to benefits, but if she would no longer be disabled, the substance abuse is "material" to the disability and the claimant is not entitled to benefits.  42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled. ").

In this case, the ALJ followed the proper procedure, which is laid out in 20 C.F.R. § 404.1535(b). She found that Plaintiff met the requirements of Listings 12.04, 12.06, and 12.09, and so was disabled, but also found that there was medical evidence of alcohol abuse. Therefore, under § 404.1535(b), she had to determine whether Plaintiff would still be disabled if she stopped drinking. The ALJ found that Plaintiff would still have the severe impairments of depression and anxiety, even if she stopped abusing alcohol, but that Plaintiff's impairments would no longer meet the requirements of any Listing. She specifically found that the requirements of Listings 12.04 and 12.06 would no longer be met, and evaluated

Plaintiff's RFC in light of the evidence.[5] The ALJ thus determined that alcohol abuse was "material" to Plaintiff's disability, meaning that, absent the alcohol abuse, Plaintiff's impairments would not meet or equal any of the Listings and also that she would have the RFC to be able to work (the RFC determination is discussed further below). In simpler terms, Plaintiff's alcohol abuse materially contributed to her inability to work, and claimants are not entitled to benefits when a materially contributing factor in their inability to work is their own abuse of alcohol or drugs.

Plaintiff cites to *Brown v. Sullivan*, an unreported Northern District of Illinois case from 1992 in which the court reversed the ALJ for failing to explain why he rejected a physician's opinion that the claimant met Listing 12.09. No. 91 C

---

[5] It is patently obvious that Listing 12.09 would no longer be applicable if drug and/or alcohol abuse were eliminated, so the ALJ did not need to explicitly state that 12.09 would no longer be met. Moreover, Congress added § 423(d)(2)(C) to the Social Security Act as part of the 1996's "Contract with America," and thus eliminated the possibility of awarding disability benefits for alcoholism or drug addiction (*i.e.*, under Listing 12.09) alone; a claimant who is an alcoholic or drug addict can only get benefits if she would otherwise be disabled. The new provision necessarily rendered Listing 12.09 superfluous as a trigger for benefits: under § 423(d)(2)(C) and 20 C.F.R. § 404.1535(b) it is impossible for a claimant to be found to be "disabled" under Listing 12.09, as a claimant can only meet 12.09's requirements while using alcohol or drugs, and therefore the substance abuse would always be "material" to the 12.09 finding such that the claimant would "not be considered to be disabled." Any argument by Plaintiff that she is entitled to benefits simply because she meets the requirements of Listing 12.09 is thus meritless. *See Gross v. Astrue*, No. 09-60-GWU, 2010 WL 148821, *3 (E.D. Ky. Jan. 14, 2010) (claimant who had been found disabled under 12.09 alone had benefits terminated upon enactment of § 423(d)(2)(C)); *Dominguez v. Astrue*, A-06-CA-913-SS, 2007 WL 6344512, *15 (W.D. Tex. Oct. 9, 2007) (amendment under Contract with America "preclude[s] an award of benefits for claims...based on alcoholism as a disability"); *Doherty v. Barnhart*, 285 F.Supp.2d 883, 895 (S.D. Tex. 2003) (though 12.09 met, § 423(d)(2)(C) prevented award of benefits).

4419, 1992 WL 133016, *2-3 (N.D. Ill. May 29, 1992).[6] First, *Brown* was decided before Congress added § 423(d)(2)(C) to the Social Security Act in 1996, and therefore does not address the impact of that subsection on the analysis of cases in which alcohol or drug abuse are present. Further, Plaintiff's argument relies on Dr. Mehr's finding that Plaintiff met Listing 12.09, with which the ALJ agreed; Dr. Mehr also found that "DAA [drug addiction and alcoholism] IS MATE[R]IAL." (Tr. 349, 361). Unlike the ALJ in *Brown*, here the ALJ did not reject Dr. Mehr's finding that Plaintiff met 12.09, but rather agreed with it. After finding that Plaintiff met Listing 12.09 (as well as 12.04 and 12.06) and was thus disabled, the ALJ was required to then determine whether the alcohol abuse was material to the determination that Plaintiff was disabled – whether she would still be disabled absent the alcohol abuse. She, like Dr. Mehr, found that Plaintiff's alcohol abuse was material to the determination of disability. The ALJ did not err in following this procedure, or in proceeding with the analysis after finding Plaintiff to have met Listing 12.09.

## II.    Support for the ALJ's finding that Plaintiff would not meet or equal the requirements of any Listing absent substance abuse

Plaintiff next complains that the ALJ did not adequately state her factual basis for the conclusion that, absent her alcohol abuse, Plaintiff would have severe impairments but would not meet a Listing.[7] Plaintiff cites to Social Security Ruling

---

[6]    The *Brown* court also found that the ALJ had failed to adequately support his evaluation of the claimant's RFC in the absence of alcohol abuse; the ALJ's determination of Plaintiff's RFC is discussed below.

[7]    She also complains in this section that the ALJ failed to follow the prescribed sequential evaluation procedure, but, as discussed above, the ALJ did follow the

("SSR") 83-19, which she claims would require a state agency physician or psychologist to "review[] each impairment individually before combining the impairments." (Doc. 16 at 13-14). However, as pointed out by Defendant, SSR 83-19 was rescinded by SSR 91-7c in response to the Supreme Court's decision in *Sullivan v. Zebley*, 493 U.S. 521 (1990), and therefore cannot be relied on to undermine the ALJ's decision.

SSR 96-6p was issued by the agency in order "to restore to the Rulings and clarify policy interpretations regarding administrative law judge and Appeals Council responsibility for obtaining opinions of physicians or psychologists designated by the Commissioner regarding equivalence to listings in the Listing of Impairments (appendix 1, subpart P of 20 CFR part 404) formerly in SSR 83-19." SSR 96-6p. On the issue of medical equivalence to a Listing impairment, it provides that the ALJ

> is responsible for deciding the ultimate legal question whether a listing is met or equaled. [The ALJ] is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments. However…the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight. The signature of a State agency medical or psychological consultant on [certain form documents] ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.

---

proper procedure, modified as required by the statute and regulations because of Plaintiff's alcohol abuse.

SSR 96-6p. *See also Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."); 20 C.F.R. § 404.1526(b) ("Medical equivalence must be based on medical findings…We will also consider the medical opinion given by one or more medical or psychological consultants designated by the Commissioner in deciding medical equivalence."). Plaintiff does not cite any particular evidence or medical opinion that she wishes the ALJ had considered on this issue, and the Court finds that the ALJ appropriately relied on both record evidence and medical expert opinions as to the severity of Plaintiff's claimed impairments.

Here, the ALJ did receive and give appropriate weight to both the evidence and to the state agency physicians on the issue of equivalence to a Listing after eliminating the effects of her alcohol abuse. (Tr. 17-20). She determined that Plaintiff's impairments did not meet or equal Listings 12.04 or 12.06 when the effects of her alcohol abuse were eliminated, as she would have only mild restriction in activities of daily living, moderate difficulties with social functioning, moderate difficulties with concentration, persistence, or pace, and no episodes of decompensation, so she would not meet the requirements of paragraph "B" of Listings 12.04 or 12.06, and she would not meet the requirements of those Listings' paragraph "C." (Tr. 17). She more fully explained that these findings were based on the facts that all (or all but one)[8] of Plaintiff's documented episodes of intentional

---

[8]      This one instance was when Plaintiff cut her finger on a can: the ALJ was not sure, but believed that this was accidental, and the Court finds that the records support this interpretation. (Tr. 347).

self-harm were linked with alcohol use, and that her symptoms "appear to be amenable to treatment." (Tr. 18-19). She also considered Ms. Butler's report, but did not give it significant weight because it was not supported by the record insofar as it implied that Plaintiff would still be disabled absent alcohol abuse.[9] (Tr. 19-20). And as discussed above, the Court cannot say that the ALJ's interpretation of the relationship between Plaintiff's alcohol abuse and her self-mutilation vis-à-vis Ms. Butler's interpretation is without substantial support in the record.

Specific to Plaintiff's functional limitations considered under the paragraph "B" requirements of Listings 12.04 and 12.06, the ALJ found that Plaintiff had only mild restrictions in daily activities, and that her limitations on her daily activities were attributable to alcohol abuse. (Tr. 19). Plaintiff had only a moderate restriction on her ability to socialize as "there is no record of evictions, altercations, or severe social isolation," she had been getting out more, and Dr. Farrar had noted that she maintained appropriate eye contact and was cooperative. (Tr. 20). The ALJ also found moderate restrictions on Plaintiff's "ability to concentrate and attend," giving "some weight" to Plaintiff's allegation of memory and concentration problems, but Dr. Farrar had concluded that there was no indication of a thought disorder and that Plaintiff's short-term memory was not significantly impaired. (Tr. 20). As indicated by this explanation, the ALJ relied on Dr. Farrar's opinions, but, as he had not factored out her substance abuse, his opinion's usefulness was limited. (Tr. 20).

---

[9]     The ALJ's treatment of Ms. Butler's opinion is discussed further below.

Finally, the ALJ gave "significant weight" to the other state agency physicians' opinions as to medical equivalence, as required by the regulations. Dr. Mehr found that Plaintiff's alcohol abuse was "material" to his determination that she met or equaled the requirements of a Listing; the ALJ agreed with his conclusion. (Tr. 349, 361). As explained above, this finding that alcohol abuse was material to the determination of equivalence meant that Plaintiff could not be awarded benefits. She also relied on Dr. Beers' Psychiatric Review Technique and Mental RFC Assessment, both of which find that Plaintiff was capable of substantial gainful activity and therefore not disabled. (Tr. 323-36, 337-40). Dr. Beers specifically considered whether Plaintiff met or equaled Listings 12.04, 12.06, 12.08, and 12.09 in the absence of alcohol abuse. Plaintiff does not argue that either Dr. Mehr's or Dr. Beers' opinions were faulty in any way. The ALJ had, and accepted, ample record and medical evidence that Plaintiff's impairments did not meet or equal a Listing in the absence of alcohol abuse.

## III.  ALJ's evaluation of Plaintiff's mental impairments

Plaintiff's next argument is that the ALJ erred in "rejecting" Dr. Mehr's determination that Plaintiff had "marked" restrictions in her ability to handle activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Doc. 16 at 14). As discussed above, the ALJ did not reject this finding, but rather agreed with its conclusion – both the ALJ and Dr. Mehr found that Plaintiff would be disabled under several of the Listings of mental impairments, but both also found that Plaintiff's alcohol use was material to the determination of disability. Again, Plaintiff, in complaining that the ALJ "changes

the issue to the stopping of substance abuse," appears to have missed the fact that her substance abuse's effect on her other impairments *is* the key issue in this case. The ALJ's evaluation of Plaintiff's mental impairments was proper.

## IV. The ALJ's partial rejection of Idelle Butler's opinion

The ALJ relied on Ms. Butler's opinion in finding that Plaintiff was disabled when considering the effects of her alcohol abuse, but did not give it significant weight when evaluating Plaintiff's symptoms absent the alcohol abuse. (Tr. 16-17, 19). As an "other source" (not an "acceptable medical source"), Ms. Butler's opinion is useful to an ALJ, and the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p. Here, the ALJ did consider and give some weight to Ms. Butler's opinions where appropriate, but also explained why she did not fully rely on Ms. Butler's opinions when evaluating Plaintiff's symptoms absent the alcohol abuse: Ms. Butler's opinion that Plaintiff would be disabled even without her alcohol abuse conflicted with substantial record evidence that Plaintiff's only serious exacerbations of her symptoms occurred when she was intoxicated. She has thus fully complied with the applicable regulations, and has given appropriate reasons for her limited use of the evidence from Ms. Butler.

Plaintiff states in connection with her discussion of Ms. Butler's opinion that "[t]he ALJ has it backwards. Substance abuse and cutting are to relieve or numb the stress and anxiety and the anticipated panic attacks. Substance abuse is a

coping technique for her anxiety. (R. 392). It is the anxiety that affects her work."

(Doc. 16 at 15). Throughout her brief, the root of Plaintiff's complaints appears to be

that she does not understand that if a claimant's alcohol abuse is material to her

disability, she cannot receive benefits. Here, she is arguing, relying on Ms. Butler,

that she only drinks *because* she has the underlying impairments of depression and

anxiety, appearing to believe that this argument vitiates the effect of alcohol abuse

on the disability determination. No one, including the ALJ, denies that Plaintiff has

these severe impairments or that she uses alcohol in an attempt to cope with them.

However, the record evidence shows that Plaintiff's impairments only rise to a

disabling level if she abuses alcohol. It does not matter why Plaintiff drinks, even if

it is because she is depressed or anxious – if the depression and anxiety are

insufficient on their own to be disabling, Plaintiff cannot collect benefits.[10]

Also in connection with her reliance on Ms. Butler's opinions, Plaintiff takes

issue with the ALJ's determination that she should be limited to unskilled work,

arguing that "[u]nskilled work is for people with diminished mental capacity. There

is no evidence that she has diminished mental intelligence." (Doc. 16 at 15).

Plaintiff continues by stating that Ms. Butler believed she could perform skilled and

semiskilled work, so long as she was able to manage her anxiety. Indeed, the ALJ's

decision addresses Ms. Butler's concern that Plaintiff's stress be minimized, though

---

[10] Plaintiff also notes that the record does not show "that she is fired or misses work due to substance abuse." (Doc. 16 at 15). Again, the point is not that Plaintiff's drinking *directly* causes her to be unable to work, it is that, if she did not drink, her other impairments would not rise to a disabling level of severity. Her other impairments or anxiety and depression are only disabling while she abuses alcohol – in that situation, the alcohol abuse is "material" to the disability determination and Plaintiff cannot receive benefits.

in a different way than Plaintiff wishes. The ALJ was quite clear both in her statements at the hearing and in her opinion as to her rationale for limiting Plaintiff's understanding, remembering, and carrying out of work instructions to those learned within 30 days, and limiting her to a routine, repetitive work environment: to minimize stress. (Tr. 17-18, 59). It is obvious that a difficult, highly skilled job is typically more stressful than an unskilled job. She did not find or imply that Plaintiff suffered from low intelligence, and did not err in her treatment of Ms. Butler's opinions.

## V. The ALJ's opinion that Plaintiff is not disabled is supported by substantial evidence

As discussed above, the ALJ found that Plaintiff met or equaled Listings 12.04, 12.06, and 12.09, and thus would be considered disabled, but that her alcohol abuse was material to the determination that she met those Listings, so she could not be considered disabled, pursuant to 42 U.S.C. § 423(d)(2)(C). She then evaluated Plaintiff's RFC to determine whether Plaintiff would be capable of working if she were to stop drinking, and found that she had the RFC to perform work at all exertional levels, with certain limitations to reduce her stress levels. She relied on the vocational expert's testimony to determine that there were a sufficient number of jobs in the national economy with that could be performed by a person with Plaintiff's RFC, and thus found her to be not disabled.

The ALJ's determinations as to whether Plaintiff met or equaled the requirements of the Listings have been discussed at length, above, and the Court has found that the ALJ's analysis on that issue was proper. Likewise, the Court finds that the ALJ's analysis of Plaintiff's RFC and conclusion that Plaintiff was not

disabled were supported by substantial evidence. The record evidence discussed above amply demonstrates that Plaintiff's symptoms of depression and anxiety were exacerbated when she drank, and that both she and her care providers believed that alcohol was a significant problem in her life; she was not hospitalized for any depression- or anxiety-related symptoms when she had not been drinking. (Tr. 290-95, 268, 214, 224, 240, 212, 219, 271, 278, 274-75, 297-98, 310-11, 303, 305). Plaintiff herself several times acknowledged that "her alcohol consumption contributed to her downward spiral" (Tr. 240), "the need to address her alcohol use and to abstain from further alcohol use" (Tr. 212, 219), that she "shouldn't drink," (Tr. 373), and that her suicidal thoughts were attributable to drinking (Tr. 275). Moreover, the state agency evaluators, Dr. Beers and Dr. Mehr, on whose expert opinions the ALJ is entitled to rely, agreed that Plaintiff's alcohol use was the primary contributor to Plaintiff's inability to work. (Tr. 323-36, 337-40, 349-62).

The RFC the ALJ found for Plaintiff was supported by substantial evidence. As discussed above, Plaintiff's serious exacerbations of her depression and anxiety were accompanied by binge drinking. Further, as the ALJ noted, her symptoms appear to be amenable to treatment – both the medical record and her testimony show that her medications were effective throughout most of the period of claimed disability. There were a few times when Plaintiff's care providers noted that they were changing her medications in order to improve her symptoms, but the overall message is that the medications were helpful to her. She herself noted that her medications enabled her to function, and that when she had occasional breakthrough anxiety, a dose of Xanax typically controlled it within 20-30 minutes;

she also had no side effects from her medication. (Tr. 38, 40). Since, when not drinking, Plaintiff could control her symptoms with medication, there was nothing to significantly limit Plaintiff's ability to work, so the ALJ found that Plaintiff had the RFC to perform the full range of work at all exertional levels, except for certain nonexertional limitations needed to reduce Plaintiff's stress.[11] This finding was reasonable and supported by substantial evidence. The vocational expert testified that there were a significant number of jobs in the national economy that could be performed by a person like Plaintiff, with her RFC, so Plaintiff was properly found to be not disabled.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 15) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 17) is GRANTED.


CASE TERMINATED.


Entered this <u>31st</u> day of October, 2011.


s/ Joe B. McDade

JOE BILLY McDADE

United States Senior District Judge

---

[11]     Indeed, Dr. Beers and Ms. Butler both specifically found that Plaintiff had significant work-related skills. (Tr. 339, 389-90)